OPINION
{¶ 1} In April 2001, defendant, Deandre B. Farr, was indicted and charged with one count of possession of crack cocaine, one count of tampering with evidence, and one count of failure to comply with an order of a police officer. Following a two-day jury trial, defendant was convicted of all three counts and sentenced to three years' incarceration. Defendant now appeals raising the following two assignments of error:
{¶ 2} "[1.] The decision of the trial court to deny the defendant's motion for acquittal made at the close of the state's case was error as the evidence was insufficient to support the charge as made under [R.C.] 2925.11, 2921.12, and 2921.331.
{¶ 3} "[2.] The verdict is against the manifest weight of the evidence when there is no substantial evidence upon which a trier of fact could reasonably conclude that the elements of the offense has [sic] been proven beyond a reasonable doubt."
{¶ 4} Four Columbus police officers testified prior to the defendant testifying on his own behalf. Those eyewitnesses were Officers Bret Bodell, Khaled Bahgat, Shawn Barton, and John Whitacre. Officer Bodell testified that he had been a patrol officer for over ten years and had been involved with, or witnessed narcotics transactions almost every day on patrol. (Tr. 23, 27-28.) On December 30, 2000, Officer Bodell and his partner, Officer Whitacre were working special duty, in uniform, in the area of a Columbus Metropolitan Housing Authority complex. (Tr. 24.) According to Officer Bodell, this area was patrolled regularly because it had a high crime rate, including pervasive drug use, and drug-related crimes. (Tr. 24.)
{¶ 5} At approximately 7:40 p.m., Officers Bodell and Whitacre observed a known drug abuser approach one of the apartment units under surveillance, speak with an individual for a short period of time, and then leave the area in his vehicle. (Tr. 25-26.) Officer Bodell testified that he and Officer Whiteacre suspected that this individual was attempting to buy narcotics but had been turned away because the drug dealers in the area knew from experience what time of day the area was being patrolled. (Tr. 26.) With that in mind, the two officers followed the individual as he left the housing complex suspecting that he might have arranged a purchase at a nearby location. As the suspect left, the officers followed him as he drove eastbound on Markison Avenue to Lockbourne Road. As the suspect pulled into a gas station at the intersection of Frebis Avenue and Lockbourne Road, the two officers pulled into an adjacent parking lot where they could continue their surveillance.
{¶ 6} As the suspect pulled into the gas station, he parked his vehicle in a secluded area of the lot and made a call at a pay phone. (Tr. 31-32.) A few minutes later, another vehicle, a green Isuzu pulled up so that the drivers' windows of the two vehicles were aligned. The officers then observed the driver of the green Isuzu hand some small objects through the door window to the driver of the vehicle that they had followed. (Tr. 32.) Officer Bodell then radioed for a marked police vehicle in order to make an investigatory stop. (Tr. 34.) Officer Bodell specifically testified that the marked vehicle pulled into the gas station lot with its lights activated, as Officer Bodell drove into the lot in his unmarked vehicle. (Tr. 34, 52-54.)
{¶ 7} As soon as the patrol car arrived, the right front passenger in the green Isuzu exited and ran on foot away from the vehicle and across the lot which had just been covered with a fresh layer of snow. (Tr. 35.) As Officer Bodell drove into the lot, he had to take evasive action to avoid being hit by the car driven by the original suspect. (Tr. 36.) After doing so, Officer Whitacre exited the vehicle and chased the suspect who had fled from the right passenger side of the Isuzu. At that same time, defendant, who was driving the Isuzu, also began to flee. He first backed away, but was unable to maneuver effectively as his car was sliding on the snow which covered the pavement.
{¶ 8} As defendant continued in his effort to flee, a second individual bailed out of the right rear door. (Tr. 37.) Afterwards, defendant lost control of his vehicle and hit a snow bank. When defendant hit the snow bank, Officer Bodell witnessed defendant throw a small bag out the driver's side window. (Tr. 38.) According to Officer Bodell, the area was well illuminated, and he had no difficulty observing defendant throw the bag out of the window. (Tr. 39.)
{¶ 9} After hitting the snow bank, defendant attempted to maneuver his vehicle forward; however, he collided with another snow bank and backed away again, driving past the front of the gas station. As he did so, Officer Bodell witnessed defendant throw another small bag out of his window. (Tr. 40.) After throwing the second bag, defendant slid to a stop, exited the vehicle and said "I give." (Tr. 40.) When questioned about defendant's vehicle, Officer Bodell stated that there were no other occupants in the vehicle when defendant brought it to a stop and that the only open window was the driver's side window. (Tr. 41.) Meanwhile the other two passengers were apprehended.
{¶ 10} After placing defendant into custody, Officer Bodell told Officer Whitacre where he witnessed defendant throw the two bags. (Tr. 43.) Officer Bodell observed Officer Whitacre recover each of the bags which Officer Bodell personally observed defendant throw from the vehicle. (Tr. 43, 50-51.) The contents of each of the bags was subsequently tested, revealing one containing marijuana and the other crack cocaine. (Tr. 45-48.)
{¶ 11} The second witness to testify was Officer Bahgat. Officer Bahgat testified that he arrived at the gas station with Officer Barton in a marked patrol car. (Tr. 74-75.) According to Officer Bahgat, as soon as they arrived, Officer Barton, who was driving, activated the lights on the patrol car and stopped, at which time Officer Bahgat exited the vehicle and drew his weapon, pointed it at defendant, and ordered him to stop his vehicle. (Tr. 76.) However, defendant ignored Officer Bahgat's order and fled in the direction of Officers Bodell and Whitacre. When he ascertained that Officers Bodell and Whitacre were going to apprehend defendant, Officer Bahgat turned and followed to lend assistance to his partner, Officer Barton.
{¶ 12} The third officer to testify was Officer Barton. Officer Barton also testified that the lights on the car were activated when he and Officer Bahgat entered the parking lot of the gas station. (Tr. 86.) As soon as they arrived, he observed that the two cars were parked parallel to each other, and the individual occupying the right front seat of the defendant's vehicle fled on foot as defendant attempted to drive away. (Tr. 86-87.) At that time, Officer Barton exited the patrol car and drew his weapon pointing it at defendant as defendant's vehicle drove toward him. (Tr. 87.) However, defendant was able to stop short of hitting Officer Barton, at which time Officer Barton pursued the individual who ran from the right front passenger seat of defendant's vehicle. (Tr. 88.) After a short chase, Officer Barton apprehended this individual behind the gas station. (Tr. 90.) More importantly, Officer Barton testified that he was certain that the passenger did not throw or drop anything as he fled. (Tr. 91.)
{¶ 13} "Q. Officer, you stated you had eye contact on him the whole time; is that correct?
{¶ 14} "A. That's correct, yes.
{¶ 15} "Q. Did you see him toss anything or drop anything during this pursuit?
{¶ 16} "A. No. * * *" (Tr. 91.)
{¶ 17} Officer Barton also testified that it would have been impossible for the front passenger to have thrown or dropped the two bags of drugs in the locations where they were recovered. (Tr. 93.)
{¶ 18} The fourth officer called to the stand was Officer Whitacre. Officer Whitacre testified that he is assigned to the Strategy Response Bureau, which is charged with investigating and eliminating prostitution and illegal narcotics. Officer Whitacre explained that he and Officer Bodell were working special duty in a "notorious location for crack cocaine sales" when they followed the white male suspect to the gas station on Lockbourne Road. (Tr. 110.) As noted by Officer Bodell, that individual parked in an unused part of the lot and made a brief phone call. Shortly thereafter, defendant drove up and made an exchange. (Tr. 111.) Officer Whitacre testified:
{¶ 19} "Q. Please tell the ladies and gentlemen of the jury what you saw * * * [.]
{¶ 20} "A. Mr. Hill [the first suspect followed from the Columbus Metropolitan Housing Complex] was in a pickup truck. And he used a pay phone here on the north side of the lot. Officer Bodell and I were in a — I believe it was a CVS or pharmacy lot just across the street here on the east side of Lockbourne. We were watching, watching Mr. Hill as he used the phone, use the phone. And when he was done on the phone, he backed up to the back part of the lot.
{¶ 21} "Q. Were there a lot of people around that area of the lot?
{¶ 22} "A. Back here, no. There were people over here at the pumps. Obviously this is an entrance here. They were coming in this way. He backed up to the far corner.
{¶ 23} "Q. Then what happened?
{¶ 24} "A. Another vehicle came off of — I believe off Lockbourne and pulled in next to Mr. Hill's car, the driver-door-to-driver-door.
{¶ 25} "Q. Would that be denoted by the F [defendant's] vehicle?
{¶ 26} "A. Yes.
{¶ 27} "* * *
{¶ 28} "Q. They were driver's door to driver's door?
{¶ 29} "A. Driver's door to driver door.
{¶ 30} "Q. In narcotics investigation does this tell you anything?
{¶ 31} "A. The narcotics sales that we have watched from vehicles that is usually what happens. Officer Bodell and myself noticed, you know, a hand-to-hand transaction. It looked to be a hand-to-hand narcotics transaction similar.
{¶ 32} "Q. Could you actually see?
{¶ 33} "A. I saw the hand-to-hand, yes, I did.
{¶ 34} "Q. Hand-to-hand between who?
{¶ 35} "A. Drivers, driver of this vehicle here the F and Mr. Hill's vehicle.
{¶ 36} "Q. Okay. And then what did do [sic] you after that?
{¶ 37} "A. We called for a cruiser to come in and make a stop because we weren't in a cruiser with, you know, beacons. We needed a cruiser to come in and make an investigatory stop of this vehicle or both vehicles.
{¶ 38} "Q. Okay. And what happened?
{¶ 39} "A. The cruiser says CPD there came in, tried to — — they turned on their beacons and pulled next to the cars here.
{¶ 40} "Q. By beacons we mean the big overhead light bar?
{¶ 41} "A. Yeah.
{¶ 42} "Q. Okay. And what did it do?
{¶ 43} "It came to a stop here next to the vehicles with their lights on. Officer Bodell and myself came across the street to assist them in the stop and let them know everything that was going on.
{¶ 44} "Q. What starts to occur?
{¶ 45} "A. We pulled in, and right around in front of Mr. Hill's truck here, as soon as they noticed the cruiser come in and the beacons come on, Mr. Hill — we stopped. Mr. Hill started to come towards us. Because of the snow and the ice and everything he was kind of — the wheels were spinning. And all this happening, a passenger, I believe the passenger front of this F [defendant's] vehicle, that individual jumped out of the car and began to run west here where the arrows are.
{¶ 46} "Q. Did you actually see that individual run?
{¶ 47} "A. Yes, I did. I was on the passenger side of Officer Bodell's truck. And when I actually when I did see this person get out, I also jumped out of Officer Bodell's truck and started to run towards this person as he began to run.
{¶ 48} "Q. Were you drawing your weapon? Were you yelling anything? Or were you just simply trying to catch him?
{¶ 49} "A. I am simply trying to catch up.
{¶ 50} "Q. Full uniform on?
{¶ 51} "A. Full uniform minus the hat.
{¶ 52} "Q. That person takes off, front right passenger takes off behind the gas station. What tells you — hear anything?
{¶ 53} "A. I heard a lot of commotion, wheels spinning, vehicles starting to movement. I started — started to come straight towards the car. I saw Mr. Hill start coming towards us. So it was like I ran around to the outside here and followed the passenger back here. One of the officers in the cruiser beat me to this individual, actually cut across. We all ran to the back here. I think there was three of us in the back. After they were able to apprehend this person, they were able to get to him first, I was right behind him. I came back around to see where Officer Bodell was, see if he was okay. I came around to the front of the store and noticed vehicles were over here now on the south side of the store.
{¶ 54} "Q. Okay. Do you remember what kind of vehicle the [defendant's] vehicle is?
{¶ 55} "A. It was an SUV vehicle. I don't remember the type.
{¶ 56} "Q. Okay. Would an Isuzu Rodeo appear in terms of the way it appeared SUV-type vehicle?
{¶ 57} "A. Uh-huh.
{¶ 58} "Q. And that was when you came back around?
{¶ 59} "A. Officer Bodell's truck, and the truck was over here on the south side still.
{¶ 60} "Q. Okay. What did you do then?
{¶ 61} "A. I came around to make sure he was okay. Officer Bodell was talking to the individual driver of this car. They had already made the apprehension. I think they had cuffs on him already. And Officer Bodell said another passenger had jumped out of the vehicle and went in the store. I started to go back to the front of the store, and that individual came out to meet me. He was — I think there was a couple other females working the store, and there's maybe a couple other people in the store. But this individual came out. Officer Bodell said it was a male black. He came out and met me and I talked to him." (Tr. 112 -117.)
{¶ 62} After the suspects had been detained, Officer Whitacre accompanied Officer Bodell and recovered the two bags thrown by defendant from his vehicle. (Tr. 118-123.)
{¶ 63} In his first assignment of error, defendant maintains that his charge and conviction is not supported by legally sufficient evidence. Sufficient evidence is evidence which is legally sufficient to support a verdict. In State v. Thompkins (1997), 78 Ohio St.3d 380, the Ohio Supreme Court explained:
{¶ 64} "With respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. * * * In essence, sufficiency is a test of adequacy. * * *" Id. at 386.
{¶ 65} When reviewing a conviction challenged on the basis of the sufficiency of the evidence, the evidence must be construed in a light most favorable to the prosecution, and the reviewing court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. Stated alternatively, the verdict of the trial court will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. The question of sufficiency of the evidence presents purely a legal question regarding the adequacy of the evidence.
{¶ 66} Viewing this evidence in a light most favorable to the prosecution, we conclude that the evidence and testimony are sufficient to support defendant's convictions for possession of crack cocaine, tampering with evidence, and failure to comply with an order of a police officer. The testimony showed that defendant attempted to flee as soon as Officers Barton and Bahgat arrived in a marked cruiser with their lights on. It also showed that defendant ran from Officer Bahgat, who had his weapon drawn and pointed at defendant. Further, Officer Bodell specifically testified that he witnessed defendant throw two bags out of the driver's side window of his vehicle as he attempted to escape. At that time, defendant was the only individual in the vehicle. The bags were recovered and tested. One contained marijuana and the other crack cocaine. This evidence, construed in favor of the prosecution, is sufficient to support defendant's convictions. Defendant's first assignment of error is overruled.
{¶ 67} In his second assignment of error, defendant maintains that his convictions stand against the manifest weight of the evidence. When reviewing a verdict challenged to be against the weight of the evidence, we must examine the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and, further, created such a manifest miscarriage of justice that the judgment or conviction must be reversed. In Thompkins, the Ohio Supreme Court explained:
{¶ 68} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Emphasis sic.) Id. at 387.
{¶ 69} The court continued:
{¶ 70} "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
{¶ 71} In addition to the testimony of the officers, defendant also testified before the jury. According to defendant, he merely gave a ride to one of his passengers to the gas station to meet someone. (Tr. 143.) When they arrived, defendant pulled his car alongside the other, and according to defendant, his passenger made a transaction. (Tr. 144, 150.) According to defendant, when the police officers arrived, it was chaos in the parking lot. (Tr. 145.) He then admitted that one of the police officers had a gun drawn on him and his brother, at which time they both fled. (Tr. 145-146, 156.) Defendant also readily admitted that he had two bags of marijuana on his possession which he threw from his vehicle as he attempted to escape. (Tr. 146, 152-154.) He also admitted that Officer Bodell observed him throw the marijuana out of the window; however, he denied having, or disposing of any cocaine. (Tr. 147.) When questioned about his prior convictions, defendant admitted to being convicted of two prior counts of aggravated trafficking and carrying a concealed weapon. (Tr. 147, 159.)
{¶ 72} Having carefully reviewed the evidence, we also conclude that there is sufficient competent, credible evidence to permit reasonable minds to find defendant guilty of the crimes charged beyond a reasonable doubt. In addition to the testimony of the police officers, defendant admitted that he threw bags of drugs out of his window in an attempt to get rid of evidence of a crime. Defendant also admitted that when he saw the police attempt to stop him, he fled.
{¶ 73} The jury was in the best position to evaluate the testimony of the witnesses, as well as observe their demeanor. Having carefully reviewed the evidence, we are unable to conclude that the jury clearly lost its way when it found defendant guilty of the charged offenses. Because defendant's conviction is not against the manifest weight of the evidence, defendant's second assignment of error must also be overruled.
{¶ 74} For the foregoing reasons, both of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
TYACK, P.J., and DESHLER, J., concur.